Good morning, Your Honor. May it please the Court. My name is Ethan Ballo, and this morning I speak for Suemi Gungora, who is listed second. Mr. Gungora is going first. Yes. Very well. Thank you. Mr. Ballo. And just to signpost what we're going to do, I'm going to argue the English language issue. And I understand my colleagues, Mr. Birch and Ms. Riefald, will each argue the 404B issues raised in their briefs. Of course, we're each prepared to answer any questions regarding any issues raised that the Court may have. With that, I begin. The district court erred when it reflexively denied Ms. Gungora's request to demonstrate the limits of her English language comprehension. In essence, this entire trial boiled down to her presence and use of an interpreter was a sham itself. The government enlisted testimony from the lead agent that her subsequent interview... How would doing what you're supposed to do have proven anything? It would have demonstrated the limits of her English language comprehension. I can pretend not to speak English. Oh, the question that you're having there is... It's not that hard, you know. You just sort of listen to the question and say, ma. I mean, you know, what would it have done? Well, I think it would have demonstrated the limits. She did speak some English, and even during trial in her cross-examination, she answered one question. But you can't prove... It's hard to prove a negative by putting somebody on the stand and asking them questions. I mean, how can you prove... I mean, she may very well understand the question and find it in her interest to pretend not to. Well, I'd have two answers to that. One, the notion that a defendant could feign testimony or lie or perjure herself, like any other witness, was soundly rejected in this country about 100 years after its finding. The common law tradition was defendants could never testify for that very reason, Your Honor. We couldn't have a defendant testify because they would have a motive to lie, so we barred it under the common law. Okay. And so that... I'm sorry. I'll explain to you why that's not a good answer. You have a better answer? I do. I can... You know, I've put some thought into sort of how I would cross-examine her. Let's say I was the government, and what I would have done as a trial lawyer... Let me just tell you the skepticism I have about your first answer, which I think is going to apply to the second answer, too, is this is really not a question about testifying. She was not prevented from testifying. What she was prevented from doing is have an experiment on the stand in the courtroom, a courtroom experiment, to demonstrate her inability to speak English. I mean, you could have asked her questions about the time of day or whether it's snowing outside or anything else to demonstrate what you were trying to demonstrate about her ability to speak English. So this was not something about conveying information orally to the prior effect. So this is not like the case where, say, you can't speak English, you can't testify. This is a demonstration. This is like an experiment. Don't district judges have wide discretion in deciding whether experiments are to be performed in the courtroom? Most certainly the district court has wide discretion. If it doesn't reach a constitutional standard of denying her right to testify, then it's an abuse of discretion standard. I guess what I'm questioning is whether this implicates the right to testify at all. Well, I think it does. I think it's similar to Rock v. Arkansas. If you remember Rock, what happens in Rock is... I don't remember Rock. Tell me. It's a manslaughter case out of Arkansas. The woman gives some information about how her husband was shot. It's supposedly accidental. She goes to a hypnotist. She has refreshed memory. During the memory of the hypnotist, she remembers that he bumped her when she got shot. They were fighting. She grabbed the gun. He hit her. The gun went off. The trial lawyer then went and had the gun examined. What the examination showed was it actually had a hair trigger, and the gun was prone to fire, not by pulling the trigger, but by being bumped. So it corroborated her defense. She went to trial, and the trial court, this was a state court case, said, Oh, she can testify to everything she remembered and whatever factual record you have before the hypnosis, but whatever happened that was enhanced by hypnosis is barred from the jury. So she can testify, just not to that. She was convicted of manslaughter. She got sentenced to 10. The Supreme Court said that's the equivalent of denying her right to testify. Yes, she took the stand, and, yes, she took the oath. But the limits were disproportionate. What does that have to do with this case? In that case, she was barred from testifying about something concerning the crime. Here, the demonstration, whether she can speak English or not, doesn't have anything to do with what she testifies to. She could test her ability to speak English by asking her questions wholly irrelevant to the case. Can I tell you why I disagree, Your Honor? The problem with the case at this point is you had someone named Gallagher from H&R Block testify that all H&R Block tax preparers have to be fluent, which is a pretty massive standard. You had the case agent. There was two agents that testified. One didn't mention whether or not the day of the raid interview was in Spanish or English, neither the prosecution or the defense asked a question. I think it was agent Yepes that testified that subsequently, about six months later, nine months later, she comes in and she gives an interview in English. It's her preferred language. Her supervisor testified, Robert Meyer, that she was poorly proficient in English, used help by another office worker, and was not fluent in English. During this entire time, the jury is observing her using a Spanish-speaking interpreter, and the government's theory is she's fluent, not that she's marginal, not that she understands that she is fluent in this English language, and they're really running a jewel case where she should be observing these red flags, she should know what's going on. So her English comprehension ability was the key issue or a key issue at trial. At the same time, by using the interpreter, she's essentially under government's argument perpetrating a sham from Jump Street. She is so sophisticated that she knows when she's arrested this is going to be her trial defense, so she starts using the interpreter from day one of the case through trial because she knows she's going to pretend she doesn't speak English. So you're not precluded from asking her whether she can speak English. Right, but that, we think, is a problem. No, I'm just asking. You're not precluded from doing that. No, and we were not. So she can testify to this, and the jury can believe her or not believe her. You want to demonstrate, you want to use some sort of demonstration to prove her comprehension of English. Exactly. And you could have asked her a question in English, and she could have answered it falsely and still have proven a comprehension of English, right? The notion that she Whether she testifies truthfully or falsely, it doesn't really matter. The question is, does she understand? Well, I think the jury is entitled to make the credibility determination, and we think this was a unique opportunity. A demonstration of a foreign language or a language you don't speak as your native tongue is far more effective than using interpreter when the entire basis of the interpreter is being called into question by the government's case. And how exactly would this have gone? I think the defense lawyer, well, one, I think the first problem is the judge reflexively denied it. How would it have gone? Just answer my question. There was no proffer. I think it would have gone. They would have asked her questions in English. I know what my cross would have looked like. So she would have asked a question in English, and she would have stood mute or said, I think she would have demonstrated the limits of her ability depending on the nature of the question, its length, and its complexity. And why can't the district judge say, I think this is sort of a sham, I think that she would fake it. This is not a question about her testifying and telling her story. This is a question of her demonstrating ability to the jury, which she has in full control to fake. I mean, pretending not to understand the question is the easiest thing in the world. Well, I don't know if it's the easiest thing in the world. Under Gillen, Water, and Christian. Well, maybe not the easiest, but it's right down there with the easy stuff. Under Christian, 749F3806, which is an expert testimony case, and under Gillen, Water, which is also an exclusion case, the district judge at least had to put her on the stand and do the experiment outside the presence of the jury. The district judge under Pedrosian had an obligation to evaluate her. It couldn't, I disagree, Your Honor, that she couldn't reflexively say, it's out, I can't do it, without actually doing any analysis. And I think it's that reflexiveness which is disproportionate to the ends of the evidentiary exclusions, which is where the district court erred. What if you propose to use a Ouija board? Could the district judge just say no? Yes, I believe the district court should say no. Why can't the district judge equally say, look, this is the kind of experiment that's so inherently flawed that I will not let it happen in my courtroom? Because it wasn't inherently flawed, and that's a question of fact. I guess that's the part I'm not getting. Why isn't it inherently flawed? Because she can just stay in there, mute, and the easiest thing to pretend, I don't understand. You know, her lawyer says don't answer. Or, you know, she knows she's smart enough to know not to answer questions in English. Who is to prove that she's not understanding as opposed to faking it? It's all in the mind. No, it's up for a jury who's observing her, and juries are smart, and credibility determinations are made every day. I've got 30 seconds. I'll try to come up with a better answer when I let everybody else argue, Your Honor. Okay. Thank you. Who's next? Good morning.  Good morning. The most important issue in this case is the admission of all of the other crimes, land patent evidence. And I think the issue is, first, is it inextricably intertwined with the OID scheme? And if it wasn't, then was it? It was intertwined, no doubt, right? The question is whether it's inextricably intertwined. This is not completely separate. I'm asking you a question. I'm suggesting an answer. My understanding of it is that it wasn't intertwined. Well, the two schemes were. I mean, it's not like this happened in a different time and place. But they were. They really had nothing to do with each other. The only similarity was that they were the same victims of the schemes, but the OID scheme was related to the IRS and tax returns and 1099 forms, and the land patent scheme really had absolutely nothing to do with that. It was simply that they were the same victims. The government did not need the land patent scheme in order to prove the OID scheme. It wasn't part of the same transaction. In the indictment, the government does mention the land patent scheme but doesn't say anywhere in the indictment what the land patent scheme is. And I think another important thing to point out is that if the government needed the land patent scheme in order to prove the OID scheme, in the separate trial of the codefendants, Gongora and Lynch, which brought out had to, of necessity, bring out the OID scheme, they didn't mention the land patent scheme at all. Didn't they use the land patent scheme to find customers or patsies or clients for the OID scheme? The customers were the same. There were seven witnesses who testified about the land patent scheme, and then when that didn't work, they... So when I said they're intertwined, you really can't disagree with that, can you? I mean, they use the same customer. They try one thing and then they try another thing, right, on the same customers. That's true. There's no dispute that it was the same witnesses. So we're talking about... Whether it was inextricably... That's what I said. I mean, we're really not talking about intertwined. We're really only talking about inextricably intertwined. Right. Whether it's... It wasn't inextricably intertwined. It was clearly... The government could clearly have proven their OID scheme or put on their OID case without mentioning the land patent scheme at all. But let me look at it this way. It's clear that in the sequence of events, we have the land patent scheme that turns out not to work, surprise, and then the people who had been, as it were, victimized by the land patent scheme, they are open for another scheme by the same set of defendants, and the same set of defendants says, well, hell, we're going to take care of your problem. I understand that you could tell the story of the OID without any reference at all to the land patent scheme, but it makes more sense. It's a more understandable story if you understand how these victims came to these people in the first place, what their state of mind was, and so on. So I see some relevance. The real question is, what's the balance of relevance to help the government tell the story and the prejudice to your client? That's the argument, right? Well, I think the similarity or the bringing the victims from one scheme into the other when the first one didn't work, that would be, I think, more appropriately a 404B evidence than the issue is, did the court properly evaluate the admission of other crimes evidence under 404B, under 4043, and was this an exercise in overkill and therefore required to be reversed under U.S. v. Curtin? Because here there were seven victims that testified. It was really almost half of the case. The other witnesses that testified were agents from the IRS and that sort of thing. And these victims testified at length about the land patent scheme. No, no. Let me come back to my question, though. My question really is, isn't this an issue of balancing off the help to the government versus the prejudice to you? I mean, that's what we're talking about. You mean a simply harmless error analysis? No, it's a balancing question of abuse of discretion on the judge. I mean, is this evidence about the land patent scheme so prejudicial to your client that it should have been kept out? Well, yes, I think it was overwhelmingly prejudicial. Once seven witnesses testified at length about how they were, you know, losing their homes and they were given these laminated signs and they put them in the windows and they went on at length, the jury is not going to pay any attention to anything else in the case and just see that these people were duped and it was very sad and so on. And when you read the entire transcript, you would think, because there was so much of it that came in on that, that they were charged with this land patent scheme, but they were not. So the issue is in the balancing test that the judge should have done under Rule 403, the judge exercised no discretion. There was no, in the pretrial motions and the pretrial laminate hearings, the judge did not ask and the government did not say how many of these witnesses it was going to put on or the bulk of the evidence. It only discussed what the land patent scheme was. And for that reason, it was an exercise in overkill. So if it wasn't inextricably intertwined, then it should have been limited under 403. Did the defense ask for a limit? I thought it was an objection to the introduction of evidence as such. Was there an alternative request to say, well, if you're going to let it in, at least limit the amount? Was that part of it? Well, the defense did object to the land, the admission of all of the land patent evidence. I understand. So object to it. This judge makes a balancing determination, determines this is relevant. Now you've raised a separate objection saying, well, but he let in so much of it, you know, it sort of overwhelmed everything else in the case. And the answer to that would have been to say, well, Your Honor, I understand you ruled against us on the relevance question. You're going to let it in. But at least limit how much they put. Was there a request made? Well, during the trial. You know, there's a yes or a no. There's a yes or a no. And I think when I don't get a yes, I usually assume counsel means a no, but doesn't want to, there we go, no. No. So you're now going to explain to me why this was not necessary. The defense did argue in closing argument that it was basically an exercise in overkill and that it was way too much. But the specific case. To the jury. Pardon me? In closing argument to the jury. In front of the jury, yes, they did argue that. And the jury didn't buy it, but. No, unfortunately they did not, that the jury. But, you know, you understand the difference. The difference is to say, look, you know, this is coming in. At some point, if you don't know how much of it is coming in, at some point the defense lawyer says, look, enough's enough. This is, it's one thing to let the evidence in. It's another thing to try to have it overwhelm the case. Nobody stood up and pointed that out to the judge. Not after the trial began, no. Although it's possible to do that. It's a good argument for you to think about on appeal now standing here. I think one would have to assume that once they lost their in limine motions, that at that point they just proceeded to cross examine, which is what the judge said they could do. I see I have only two minutes left. If there are any other questions. If you want to save it for rebuttal, why don't you do that. Thank you. You are representing Mr. Ruiz. So we must have Mr. Barkum representing Mr. Lynch next, right? Your Honor, good morning. Gary Burcham for Ms. Lynch. Judge Gould, good morning. The, I'd like to talk. You are? Gary Burcham. Burcham. Oh, God, I can't see anything. It's Burcham with a U. Right. Sorry. Go ahead. Thank you, Your Honor. Reset the clock to 10. I don't want to steal. I'm also going to talk about a Rule 404B issue on behalf of Ms. Lynch. In Ms. Lynch's case, the district court allowed the government to introduce evidence that between the years of 2005 and 2009, Ms. Lynch did not file her own personal tax returns. Specifically, the district court found that that evidence was admissible because it showed an intent not to comply with the tax laws. The problem with this ruling, and the problem with the admission of this evidence, is that when we have a case like this where the centerpiece of the case is knowledge and intent, and that's what this case was about for Ms. Lynch, the prior act under 404B and the instant case need to be similar. And similarity from this Court's case law essentially means that the knowledge gained from the prior act needs to be, needs to have a logical connection to the knowledge at issue in the new case. And the problem that we have. This is a non-act. It's a failure of file. It is a non-act. And the problem, the threshold problem with this is there's nothing Ms. Lynch learned from not filing her own personal income taxes when she was. . . Oh, I think she learned that the government's somewhat inattentive. It's true. The government certainly hadn't come after her and done anything in respect to that. But there's nothing in common between someone who's earning as little money as Ms. Lynch and struggling as much as Ms. Lynch was struggling, not filing personal income taxes, and a decision later to get involved in a quarter-billion-dollar tax fraud scheme. There's just simply no connection between the two. And the government says, well, they're connected because they both had federal tax law implications and they both went towards the need to properly declare income. Well, that's too broad of an approach. We need to look pursuant to Mayans, pursuant to Judge Gould, your case, Martin. Are they similar? Are they similar enough? And in this case, they're simply not similar at all. In fact, if you look at the cases the government cited in support of its argument that they were similar, those cases show what truly is similar. We had Evans, a prior fraud in a subsequent fraud embezzlement trial. Spallone, prior extortion acts in a subsequent extortion trial. Jenkins, prior false statements in a subsequent false statements trial. Diggs, prior fraud in a subsequent fraud trial. Assuming you're right on this, what reason to think that it made any difference to the jury? Well, it made a difference because of the way the government argued it. The government never tried to establish this connection between knowledge from the non-filing and knowledge as to the old quests. Did they argue to the jury? Did they say, look, she didn't file her income tax returns and therefore you must infer that she was knowingly involved in this scheme? No, no, that's not at all what the government argued. In fact, what the government argued, it was propensity. The government argued that she's a bad person, you should convict her. The government said her past failure to file tells you something about her notion of complying with tax laws. Not about knowledge with respect to old quests, not about knowing that this program was fraudulent, just that she's a bad person, she's dishonest, she doesn't comply with the law. And that is not how this evidence was ever supposed to be used. And that's why it mattered with respect to the jury. This was a three-count case against Ms. Lynch. It was a conspiracy count, count one, and then the two false claim counts. The jury acquitted her of the conspiracy count but convicted her of the two false claim counts. And I could easily see a jury, based upon this argument and based upon this evidence and the extraordinarily unfair prejudice from this evidence, maybe compromising a verdict and saying, look, they didn't prove that she knew this was a fraud, but she hasn't paid her taxes. And that's the danger with this evidence. Now, if you get prior evidence, evidence of prior crimes in, that's always extremely hurtful. But the problem is it's an abuse of discretion determination by the judge. Well, as to whether it falls under Rule 404B, it's de novo, and then the overall admissibility is certainly abuse of discretion. There's a quote from Ramirez-Robles, which I think really hits the nail on the head in this case, where probative value is slight, moderate prejudice is unacceptable. The probative value of this evidence, it wasn't just slight. I think it was essentially zero. But the prejudice associated with the introduction of this evidence could not have been included. It was inflammatory. Everyone on the jury was probably a taxpayer, and they're making her seem like an unsavory person who doesn't pay her share, doesn't comply with the law. That wasn't what this case is about, and that wasn't evidence that ever should have been included. You make a really interesting argument. I'm trying to figure out how to handle it. The argument you're making is a sensible one, which is to say that the evidence that she committed the crimes charged is actually, I'm now kind of putting words in your mouth, is overwhelming. On the other hand, the jury might have had some sympathy with her and might have engaged in at least partial jury nullification by convicting her maybe on just one of the two counts, but they didn't do the jury nullification because they thought that she was a bad person anyway. Is that the prejudice we're supposed to be looking at, that we didn't get a chance at jury nullification as to one or two of the counts? I don't think this was a jury nullification case at all. Well, what you're hypothesizing is that the jury might have taken mercy on her, had mercy on her. I'm thinking I was trying to state that the jury might have punished her. Well, no, might have, but might have. No, I think I'm with you. You may disagree with me in the end, but I'm taking your point that absent the evidence of her failing to file the earlier tax returns, the jury might have had mercy on her. The jury would have acquitted her of all three counts. Right. Despite the overwhelming evidence that she was guilty of sin. It wasn't overwhelming, Your Honor. I guess that's where we differ. It wasn't overwhelming at all. I mean, if it was overwhelming, I'd be defending three counts now, not two counts. And so if the court has no further questions, I'll reserve my floor. I have a question if I could interject. So I thought you were arguing that there would be a reasonable doubt of her innocence or guilt on the charges, but the propensity evidence sunk her ship. Your Honor, I think that's exactly right. I think she had a strong, viable defense as to all the government's points. That's illustrated by the fact that they acquitted her of the most serious conspiracy count. And like Your Honor addressed in the Martin case, and in the Martin case, Your Honor, they actually argued it for the proper purpose, for the knowledge, for the connection of knowledge. In this case, that argument was never made. It was only argued for propensity. And so Your Honor reversed in Martin based upon the effect of that propensity argument, the damage it does, especially in a tax context. And in this case, that was the only way that this evidence was ever used by the government. And so I think that there was more than a reasonable doubt as to whether she knowingly participated in this fraud. And I think it's possible that this propensity evidence was considered by the jury and Koster with respect to the false claim counts. And so I think Your Honor is correct. Okay. You may save your remaining time for rebuttal. Thank you, Your Honor. We'll hear from the government. Please support Charles Pell on behalf of the United States. Good morning. With me are Counsel Tabar, the two IRS agents that are the case agents. I see. And so you're the only lawyer here for the government. You're going to be arguing. I'm going to argue everything. I just wanted it to be three on three, so we did that, Your Honor. I'm sorry? I wanted it to be three on three instead of three on one. Well, if it comes to hand-to-hand combat, I think you're going to be all right. I tried to think ahead, Your Honor. I'd like to start off responding to the Ruiz argument that was made today as to the land patent. And I just want to correct something and then add to what wasn't said. And let me just respectfully, if I may, correct this representation or argument that it was half of the evidence, the land patent evidence. We laid out in the brief, Your Honor, first as to the exhibits, fewer than 10% were land patent exhibits. And even of that 10%, most of those were just checks, so checks to Old Quest that would say land patent on it. So I just want to make that clear. How about in terms of pages of testimony? You know, I looked at that, Your Honor, too, and I think I said it in the brief briefly, but with the exception of Mr. Carpio, most of it was a small percentage, not 50% of the testimony of individual witness. Mr. Carpio, I think his total testimony might have been 10 pages, something like that. His was more in terms of the testimony. But it was exactly like you said, Chief Judge Kaczynski, which is the testimony is, how did you find out about Old Quest? I had this land patent program that I got burned on. But they told me, oh, there's this better program where you can do. In fact, the evidence will show in the testimony that some people started paying for land patent, right? And it didn't work. They just continued paying to Old Quest just as they were before. But instead of land patent, they were getting the OID. And that goes to the inextricably intertwined, Your Honor. You kind of hit the nail on the head initially. But it's the customers, Your Honors. It's the timing. It's right afterwards. It's the same company. It's Old Quest. It was Old Quest for land patent, Old Quest for OID. It was the same bank accounts. The checks were being deposited into Old Quest and to Old Quest. The same main people, and I think that's important. Mr. Ruiz, Defendant Ruiz was the main person in both companies. Mr. Mendoza, same thing. So it also went to show their leadership role. And what wasn't brought up here also was it's in the indictment. It's alleged as part of the conspiracy. But we also had a limiting instruction was given, Your Honor. And more important than that, this judge, Chief Judge Kaczynski, you raised the argument. I'm not Chief Judge anymore. Oh, I'm sorry. I thought I heard somebody say that. I apologize, Your Honor. I think I think Judge Fletcher said presiding judge. Oh, presiding judge. My apologies. Nobody raised the objection at trial as what the big argument they're making here as to the exercise in overkill. It wasn't made, Your Honor. They had, and I'll note, we gave the exhibit list and witness list, I believe, two weeks before trial. So not only would they not be being blindsided at trial, but they had that well in advance of trial. They could have raised the objection there. They could have raised the objection during trial. So that would make it, as opposed to abuse of discretion, I would argue that plain error potentially could apply, because the argument here is more focused on the extent of the evidence as opposed to the initial admission. So that's my general arguments to respond to the release of 404B. And if there's no questions on that, I'm ready to go to the next one.  Okay. Thank you, Your Honor. I would like to next go to the Lynch 404B argument that we just heard. And I'd like to start where defense counsel left off with the questions of this court as to the amount of evidence. I believe defense counsel said something along the lines that there really wasn't a lot of evidence. There wasn't substantial evidence of her guilt. And I'd like to just briefly relate to the court what we did in our papers as to the amount of evidence. Ms. Lynch, H&R Block trained ---- I'm sorry. You are jumping ahead to the prejudice question. Yes. I wanted to start where he left off and then come back to the ---- You're not conceding ---- Absolutely not. That's fine. I just wanted to make sure I understood. Yes. Thank you, Your Honor. Ms. Lynch, an H&R Block trained tax return preparer. Evidence admitted at trial ---- H&R Block. That's pretty impressive. Well, it's more than just somebody saying I have no knowledge of tax returns, Your Honor. This is someone that went through the formal training to be trained. Fair enough. Okay. Fair enough. And she emphasized it on her resume. She emphasized that that is one of her skills. She was experienced at preparing returns. We had testimony from individuals who had had multiple years of tax returns prepared by her. She was registered with the state, CTEC, which is a requirement if you're going to prepare returns for others. More than that, then, so that's her background. Then we had her knowledge. And one moment, Your Honors. The tax returns themselves, they claimed ridiculous numbers, and putting that into context with somebody who has tax return training, there was testimony as to the general knowledge of the IRS fraud alerts at Old Quest that the returns were being frozen, refunds were being frozen. And Exhibit 500, that's available at 855 of the government's excerpts, was an email sent by the defendant to another co-schemer, July 29, 2009, attaching the link for one of the IRS's warnings specifically addressing why the OID program was a fraud. And we attached that email, and the link is also another exhibit that explained why it was fraudulent. And when I was preparing this morning, I do want to make one correction to my brief, Your Honor, which is when I was preparing today with the agents, I said in the brief that that link went to the two-paragraph fraud alert. It actually went to the two-page fraud alert. It was a different, there were multiple fraud alerts on the Internet, and I quoted the exhibit for the two-paragraph one as opposed to the two-page one. It's actually, as much as a concession, two pages of saying why it's fraud versus two paragraphs it is, but I just wanted that to be clear on the record. Defendant admitted that she wrote the email. She admitted that she probably went to that address. She was aware of the frivolous filing letters. The way the scheme panned out is a lot of the time, the IRS did its job and didn't issue the refunds. Thank God. They claimed $200 million, probably only less than $10 million actually went out the door. What the IRS would do is when you received, when the IRS received the fraudulent tax return, it would send back a letter. We called it a frivolous filing letter that said, Your tax return is no good. You propound frivolous theories. Fix it or you're going to be fined. That was another piece of notice evidence that we argued at trial to say, look, they're being frozen. You're getting letters, and she admitted she was aware of that. And so going from her experience to her knowledge, and then now we have her conduct, and we laid it out in the briefs, Your Honors, but she, the defendant, Lynt, lied to the agents about her knowledge of the scheme. And when I say lied, when she was interviewed, and this is in the transcript for Special Agent Chan, she was asked during the search warrant. So search warrants were done in September 2009. She was present at Old Quest during the search warrant. She was asked, Hey, do you know who these specific people are? Jessica Mendoza, et cetera. She says, I have no idea who these people are. And when I crossed her on that, I established that she did know. Why? She had prepared an organizational chart of the Old Quest business, which laid out in which department people worked, tax return preparer, transmitting false documents to the IRS, et cetera, presentations. All the people she said she didn't know coincidentally happened to be in the OID department. Let me ask you this. Since you've got all of this really strong evidence against her, why bother with the evidence about her not filing income tax returns? Doesn't that, in the benefit of hindsight, seem like the kind of thing that, complication that is not worth doing? Just for the trouble it saves you on appeal? I would concede, Your Honor, that in light of now I'm facing it on appeal, in light of everything, it could have been a serious thought to why do it. But let me, if I may, explain why. Were you a trial assistant? Yes, I did approximately nine trials in this case, including, I think, seven in one year. So I did several of these trials, yes. And I had one assistant with me, or not assistant, co-counsel, Mr. Robbins, but he's no longer with the office, or he'd be here, too, arguing. Your Honor, two reasons why. It's at least questionable as to what the connection is between her failure to file private returns and the scheme. Fair enough, Your Honor. And let me turn to that then, Your Honor. First, as to the income earned from the scheme year, which is 2009, that's alleged in the indictment as part of the conspiracy. So that evidence would have been coming in as part of the conspiracy. The grand jury found that it was part of the conspiracy that the conspirators, to hide that they were involved in the scheme, would not file tax returns. So as to that year, the years I believe were 2005 to 2009 that were admitted, the 2009 failure to file year was already part of the conspiracy. It was coming in as part of the conspiracy. So it's not 404B evidence. It's part of the conspiracy. It's inextricably intertwined. So then we have the other three years that are prior to it, and I believe this goes back to the harmless. I'm sorry. I'm trying to digest that. Why wouldn't filing returns and just omitting any income they have from this have been just as good? Why did they have to not file returns at all? Why was it part of the conspiracy? I want to make sure I'm answering your question. If you're asking me why it's part of the conspiracy, because not filing the return in your name to declare the income is another way to hide that you're making all this money. But another way of doing it is to file a return and simply not declare this income. Correct. There's two ways to do it, of course, although I think staying under the system, in fact, I believe Judge Fletcher mentioned it. Maybe she did learn something from that, which is the IRS isn't looking. If you really truly want to hide, I think you don't file your tax return, and they have no idea that you're making any income at all. And as long as you're not getting reported like salary workers like we are, there's no way they know you're making business income and you're just not filing. So that's why. But that's true also if you have other income and then you're making illegal income on the side, which doesn't get reported, you're still under the radar. Filing or not filing a return on legitimate income is no more or less likely to bring you to the IRS's attention. I mean, I think both ways are doing it. There's an argument made that once you're out of the system, it's easier to hide, and once you start filing again, you actually could bring attention to because somebody. But in any event, this was alleged as part of the not filing returns at all, or was it not declaring the income? It was. My best memory, Your Honor, I believe for the one year it is failing to file tax returns. You've got lots of books there. If you guys can look up for the indictment, just go through that. But my best memory is it was on or about April 15, 2010, they failed to file the tax return for the prior year. So that's part of the conspiracy. As to the connection, Your Honor, I believe, and I do want to come back to the harmlessness because I think there's one piece I didn't tell you. But as to the connection, I think, Your Honors, I think if we go to the quintessential 404B problem that is concerns courts, there's two ways. One, when identity isn't known. A bank robbery occurred. We're trying to establish identity. Charles Pell is a defendant, and we introduced that he did four bank robberies before where there's no knowledge whether he was the one there. That's a problem, and that's a concern of propensity. The other propensity is the bad man, which I believe the argument is here. A person, because they did such bad conduct, and we get that in, that just poisons the jury as to them. This case, this case isn't a case where somebody did drugs or felon in possession, and we're introducing tax evidence to show, oh, they're a bad person because they don't file tax returns. What we have here, Your Honor, is a tax case involving false federal tax returns as opposed to state tax returns or some other tax return. We have false federal income tax returns. We're not dealing with excise tax, et cetera, and we're also dealing with the proper reporting of income. And I get the court's point as to failure to file versus actually filing a false tax return, but this is not something way out of left field that has nothing to do with the case. This is sufficiently similar under the- What is the chain of inferences that one would say, you know, failure to file a return, here is why the jury ought to be more likely to find her guilty? What's the chain of inference? I think the inferences would be this. When I got involved in the O- When I, Defendant Lynch, got involved in the OID scheme, I was really trying to follow the tax law. This was just a misunderstanding, a mistake. I actually thought you're allowed to do OID stuff and to do that type of stuff, and it was just a mistake. I was trying to follow the tax law, right? And then I think a rational jury could- And how would that fail you to file returns? Well, I think a rational jury could find that a person who failed to properly report her income for multiple years, did not follow the tax law as to the reporting of income, they could find it's more likely than not that it really wasn't a mistake when you went to the OID and were involved in a scheme of OID reporting hundreds of thousands of dollars. And again, I would like to just note two things, Your Honor. One, the 404-B, as we know, is a rule of inclusion. And second, the standard of review, as this Court already noted, was abuse of discretion. And third, I just want to reiterate another piece of the evidence that I think is really, really important to just hearken or emphasize the lack of harmless or to emphasize harmlessness, which is, Your Honor, during defendant's cross-examination, we presented a tape. And I believe the circuit court staff contacted us for a copy of that tape because it wasn't in the record for whatever reason. But it was a different tape, which you don't have in front of you, but which is a part of the exhibits that were admitted at trial. But the important part is this. The defendant is arrested when the indictments are made public. She's put into Santa Ana Jail pending detention here. She makes some calls, Your Honor. And these calls, we laid it out in our papers. But I think they're really, really important, as to her knowledge, to further show that any error, and of course we're not conceding error, but any error would be harmless, Your Honor, which is she calls another schemer, Dina Howard, which is the same person to whom she had sent the email talking about the OID warnings from the IRS. She calls her and says, Hey, Dina, I need you to go to my house and pick up my phone and my computer. That could be fairly innocent, except the next part of her statement says, They're going to go raid his house. They're going to go raid the house, the IRS. And she didn't even stop with that call. The next call, she actually calls the person who she was living with, his house, and says, Hey, Dina, Dina's going to come to your house right now. Larry's like, Why is Dina coming to my house right now, tonight? Quote, The police may get a search warrant for the house. Give her my cell phone and my laptop. Which, pretty, Your Honor, to respond to the argument that there was not overwhelming evidence is just, I think we laid it out in our papers and I emphasized it now. I think that's just not borne out by the evidence. And now I'd like to turn, last but not least, Mr. Balog's argument as to Ms. Gongora. Ms. Gongora, the English language issue. One moment. Your Honor, although I failed to do it in my papers, you hit the nail on the head. It was really an experiment in court. And the judge, the district judge, as is with other evidence, has wide discretion when dealing with experiments and evidence like that. And let me try to expand on what defense counsel was trying to respond to your questions, which is, could she present this evidence, non-English speaking, in another way? Well, Your Honor, she did. She was able to testify to it. She had a full opportunity to cross Special Agent Yepez about whether she had spoken English or Spanish during the call. But more than that, Your Honor, she wasn't precluded from presenting evidence as to her English ability skill. In fact, there was nothing to stop her from calling her family members, everybody with whom she works, everybody else who could support that, that you don't speak English. You could bring somebody up and say, when you speak to Ms. Gongora, what do you speak, English? What is her skill set? In fact, if you want to take it a step further, if that was really the critical issue at trial, they could have brought, hired an expert to evaluate her as to her English speaking skills as opposed to just trying to do this, what the district court characterized as a circus-like act, which is you argue to the jury during voir dire, hey, you're not going to hold it against my client that she speaks Spanish and she's using an interpreter. You use an interpreter, and we all know how important the statute which we cited in our papers is in terms of having an interpreter and what's required to waive that once it's happened. You use an interpreter all the way through, and then you want to say at the beginning of your testimony, here, fumble around in English for a little bit, and then we'll switch to Spanish. I believe the district court was well within its discretion to manage its court to say, no, you can't do that. You've made the decision to speak in English, and if you want to present that evidence, which they did do, they questioned, he noted, they questioned Robert Meyer as to her English ability. She testified and was able to cross Agent Yepez about whether it really was Spanish. I think with all that, it's hard to say the district court really abused its discretion in that instance. You know what? I believe I've responded to everything. Thank you. Is there anything else that the court wants to hear? I think we're fine. Thank you. Okay. Thank you very much. Thank you, Judge Gould. Okay. If you didn't have any time left on the clock, I'll give you a minute. I'll make it a minute. Otherwise, you have whatever time was left on the clock. You once asked Mr. Kastner, do you see the way the wind is blowing? So I see it. I'll be brief. Thank you, Your Honor. I think the question is, are you right? Is the demonstration inherently flawed? When a district just says, I can't do that, is that the right standard? And I would suggest, respectfully, that it's not inherently flawed, and I would ask you to consider the proposition that perhaps Ms. Congora really is incredibly limited in English. Perhaps she could testify honestly, and perhaps a jury could observe her, and perhaps a district court, when confronted with that request, could examine it and make the determination whether it's flawed in this case and assess it. And if the court is right and you adopt your position that it's inherently flawed because the defendant could lie, which I respectfully suggest is not a proper basis, any witness can lie. But if you accept the proposition that these things are true, the district court should have given her the opportunity. Defense counsel invited Judge Staten to give her the opportunity for Judge Staten to observe her and make an assessment. And the district court says, I can't do that. The district court could have. The district court should have. And we think on this critical evidence it would have made a difference. Thank you. Thank you. Thank you. I would just like to say that if the defense should have objected once the trial got underway and they saw how much of this land patent evidence was going to consume the testimony of all the witnesses and they should have objected at that point, then it's plain error affecting substantial rights. Thank you. Thank you. And for Ms. Lynch, finally, just a couple of quick points, Your Honors. Regarding the specific evidence that the government referenced, the e-mail, the statements to the agents, the call to get her laptop, Ms. Lynch testified at trial. She explained all those issues. She provided defenses as to all those claims by the government, and presumably that's why the government acquitted her of the most serious charge in this case. With respect to the harmless error, the 403 analysis, Judge Kaczynski, you were trying to get the government to give you a good answer as to why this evidence was relevant and probative. In this case, I don't think the government really could. But that goes to error. It doesn't go to harmlessness. I'm not sure how satisfied I was with the government's answer as to the chain of inference and why this was properly admitted, but I'm willing to assume it was not properly admitted, and I think Mr. Pell, I mean, Mr. Pell recited quite a bit of evidence that sounded to me pretty overwhelming, so now's your chance to tell us why it's not. Well, again, I'd reference the jury's acquittal on the conspiracy count. I'd reference Ms. Lynch's specific testimony at explaining these issues. Going back to Judge Gould, back to you and Martin, you wrote, when bad acts are not relevant, which I don't think they were in this case, and I'm not sure the government thinks they were at this point, they can only be viewed as being presented to inflame prejudice in the jury. Ms. Lynch currently has two felony convictions. She's been sentenced to custody and will report to custody if this court affirms the conviction. I just don't think it's fair that the government convicted her, in large part, based upon irrelevant inflammatory evidence. What about the argument that the failure to file in one year was part of the conspiracy, was charged as part of the conspiracy, and therefore it wasn't bad act evidence at all, it was just proving up the charge? I think Your Honor was questioning him as to why it really went to the knowledge element. It wasn't a false tax return. It wasn't an attempt to defeat or evade a tax. It was simply a failure to file. I think the argument, as I understood it, was they all agreed and were not going to file tax returns so as not to alert the IRS to what we're doing, and we're all sort of in this together, and part of cooperating in this scheme is to not report the income, not file returns. That was the argument. The answer to Your Honor's question is because she hadn't filed in the previous four years, that totally diminished the probative value of that argument, the probative value of the non-filing in 2009. It wasn't like she'd filed for four consecutive years up to that point, and in 2009 suddenly didn't file. That's a good answer, but nonresponsive. This is not a balancing question. They are saying there's nothing to balance. This was part of our theory, and that was part of our case. We're entitled to put it on, not as a matter of balancing, but just as a matter of proving up our case. Part of our case was this was one of the things we did as part of the conspiracy. There's no balancing there. They've alleged it. They are now entitled to prove it. Perhaps a better answer to Your Honor is that that's not how the government used this evidence. The government never said at any point in the trial that the fact that she didn't file tax returns in 2009 showed that she was trying to conceal the evidence from Old Quest. Again, the way this was used throughout the trial, from the 2005 non-filing all the way to the end, was propensity, she's a bad person, she doesn't file her taxes, convict her and send her to prison. Okay. Thank you. Thank you. The case is argued with 10 to the minute. We'll take a recess.
judges: Kozinski, W. Fletcher, Gould